761 F.2d 582
 Elinor HELITZER, as Executor of the Estate of Bernard
Helitzer, Deceased, Plaintiff-Appellee/Cross-Appellant,
v.
Melvin HELITZER, Defendant-Appellant/Cross-Appellee.
 Nos. 83-1055, 83-1120.
 United States Court of Appeals,
Tenth Circuit.
 April 23, 1985.
 
 Richard D. Ewy (John F. Eberhardt with him on brief), Foulston, Siefkin, Powers & Eberhardt, Wichita, Kansas, for defendant-appellant, cross-appellee.
 John R. Morse of Fleeson, Gooing, Coulson & Kitch, Wichita, Kansas, for plaintiff-appellee, cross-appellant.
 Before LOGAN and SETH, Circuit Judges, and KANE, District Judge.*
 LOGAN, Circuit Judge.
 
 
 1
 The appeals in this diversity action arose out of a contract made between two brothers with respect to their mother's property, which they believed they would take by will or by survivorship arrangements when their mother died. At the time of the agreement their mother, Lena Helitzer, lived in Florida; one of the brothers, Melvin Helitzer, lived in New York; the other, Bernard Helitzer, lived in Kansas. They were Lena's only children, were the beneficiaries under her then current will, and were on most, but apparently not all, of her "Totten" trust[1] bank accounts. At the time of execution of the agreement Lena's stock certificates and all of her other assets apparently were located in Florida. The agreement, drawn by Bernard's lawyer in Wichita, provided as follows:
 
 
 2
 "EQUALIZATION AGREEMENT
 
 
 3
 THIS AGREEMENT is made and entered into this 22nd day of January, 1968, for the purpose of effecting the equalization of an expected inheritance from Lena Helitzer.
 
 
 4
 The parties hereto being the only children of said Lena Helitzer are her only heirs at law, residuary legatees and devisees under the last will and testament of Lena Helitzer and have agreed between themselves upon a disposition of her assets which may pass to them by operation of law as a result of one or both of them being a joint tenant with their said mother on various properties now owned or hereafter acquired by her.
 
 
 5
 In consideration of mutual covenants herein contained the parties hereto agree as follows:
 
 
 6
 (1) That in the event of the death of their mother, Lena Helitzer, her Last Will and Testament will be offered to the proper court for probate and upon the filing of an inventory in said estate proceeding an accounting will be made of all of the properties held jointly by said Lena Helitzer and the undersigned, her sons.
 
 
 7
 (2) That as soon as practical and after proper inheritance and estate tax waivers are obtained by the fiduciary of said estate of said Lena Helitzer an exchange of properties between the undersigned will be effected with the result of equalizing the inheritance of each with the result that both of said sons of Lena Helitzer share equally in her estate and in all the assets belonging to her on the date of her demise.
 
 
 8
 (3) All properties covered by this agreement shall be valued as of the date of Lena Helitzer's death as for inheritance or estate tax purposes and any adjustments necessary which do not exceed the amount of One Hundred Dollars ($100.00) shall be adjusted with cash upon the final closing of her estate and after the payment of all costs of administration, expenses of last illness, burial and any claims approved of by the court having proper jurisdiction.
 
 
 9
 This agreement shall be binding upon the parties hereto, their heirs, legal representatives and assigns."
 
 
 10
 Def.Ex. J.
 
 
 11
 The complication giving rise to this litigation was that Bernard predeceased his mother, Lena. Apparently animosity existed between Bernard's widow, who served as executor of his estate, and Lena. Lena destroyed her will before Bernard's death, and shortly after his death changed her arrangements to leave most of her property to Melvin and nothing to Bernard's widow. She placed all her stock into accounts in joint tenancy ownership with Melvin. Lena also made adjustments in her Totten trust accounts to remove Bernard's name as beneficiary, or close accounts for which he was beneficiary, and to increase the monies that would pass to various grandchildren, with Melvin's two children receiving more than Bernard's one child.[2]
 
 
 12
 After Lena Helitzer's death Bernard's widow, in her capacity as executor of Bernard's estate, brought this action in federal district court in Kansas against Melvin seeking to enforce the agreement entered into between the two brothers. The district court found that it had personal jurisdiction over the parties and that the agreement was enforceable. It interpreted the agreement to require Melvin to share exactly half of all that he took as beneficiary under Lena's Totten trusts or as surviving joint tenant in her stocks. The court calculated the amount owed to Bernard's estate as $72,203.07 as of March 31, 1982. The court found that Melvin did not wrongfully induce his mother to reduce what was given to other family members, denied punitive damages, and rejected other contentions made by Bernard's estate.
 
 
 13
 Melvin appealed, asserting that: (1) the Kansas district court did not have personal jurisdiction over him, and (2) the agreement was a personal contract that became unenforceable when Bernard predeceased his mother. Bernard's estate cross-appealed raising various other issues that we need not treat in any detail in view of our disposition of this appeal.
 
 
 14
 * Jurisdiction in this case is based upon diversity of citizenship under 28 U.S.C. Sec. 1332(a). Service of process was obtained against Melvin, a resident of New York, under what was then Fed.R.Civ.P. 4(d)(7) (now 4(e) ), by complying with the Kansas long-arm statute, Kan.Stat.Ann. Sec. 60-308(b). The specific provision of the Kansas statute relied upon by the court to establish jurisdiction was Sec. 60-308(b)(5), that Melvin entered "into an express or implied contract, by mail or otherwise, with a resident of this state to be performed in whole or in part by either party in this state...." The Kansas statute, modeled upon the Illinois long-arm statute, is intended to extend jurisdiction to the outer limits of due process. Woodring v. Hall, 200 Kan. 597, 601-02, 438 P.2d 135, 140-41 (1968); see R. Casad, Jurisdiction in Civil Actions p 4.01[b] (1983). Thus, whether jurisdiction was properly exercised over Melvin is determined by ascertaining whether asserting such jurisdiction would be within the bounds of due process required by the federal constitution.
 
 
 15
 The essential test under federal constitutional due process requirements is whether defendant had such minimum contacts with the forum state as would satisfy fair play and substantial justice. International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In a situation like that at issue here, the most important consideration is that the ties or connection to the forum state, Kansas, must be the result of defendant's own purposeful, forum-related activity. Kulko v. Superior Court, 436 U.S. 84, 93-94, 98 S.Ct. 1690, 1697-1698, 56 L.Ed.2d 132 (1978); Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); see also Keeton v. Hustler Magazine, Inc., --- U.S. ----, ----, 104 S.Ct. 1473, 1480, 79 L.Ed.2d 790 (U.S. March 20, 1984) ("plaintiff's residence in the forum may, because of defendant's relationship with the plaintiff, enhance defendant's contacts with the forum."). As Professor Casad has stated:
 
 
 16
 "A defendant cannot be subjected to jurisdiction in a state with which he has no contacts; and even if there is a contact, jurisdiction will not be proper unless the contact is the result of the defendant's own purposeful conduct. It is not always necessary that the defendant's conduct take place in the forum state. In some situations it may be sufficient if his conduct elsewhere caused an effect in the state, if the litigation arises from that effect. If he acted with the intent of causing the effect in the forum state, that will normally satisfy the 'purposeful availing' requirement. Even if he did not intend that effect, however, the requirement may be met if that effect was foreseeable, and if the defendant could have anticipated being haled into court there."
 
 
 17
 R. Casad, Jurisdiction in Civil Actions p 2.05 (1983) (footnotes omitted).
 
 
 18
 In arguing that Kansas courts may not exercise jurisdiction over him, Melvin contends that the contract was executed outside of Kansas and was intended to be performed in Florida. Merely because one of the contracting parties was a Kansas resident and a Kansas lawyer drafted the contract, he asserts, is insufficient to render him amenable to suit in a Kansas court.
 
 
 19
 In our view the district court could properly find that Melvin had engaged in purposeful conduct with respect to which it was reasonably foreseeable that he might be haled into a Kansas court. The essence of the contract was that the two brothers, one a resident of Kansas and the other of New York, would split their anticipated inheritances equally between themselves. Although the contract speaks of their administering their mother's estate, they expressly anticipated that at least some of their mother's assets would "pass to them by operation of law as a result of one or both of them being a joint tenant" with their mother in properties not subject to disposition by will or subject to probate. See Def.Ex. J. It was also reasonably foreseeable, especially in view of Lena's age and declining health and her need to have someone else attend to her bills while she was receiving medical treatment, that some of the assets then owned by Lena in her own name would be placed into joint tenancy with one or both of the brothers for ease of administration. Thus, it was a distinct possibility that there would be no estate requiring probate in Florida. Indeed, this is what ultimately happened. In any event, the agreement clearly applied to property that one or both brothers might take without probate delays or order of any probate court as surviving joint tenant or as beneficiary of a Totten trust. It was foreseeable that either brother could remove property that the agreement covered from Florida to his own domiciliary state or elsewhere before or after Lena's death. If one contracting brother did not voluntarily perform his obligations under the equalization agreement, the other no doubt would sue. The most likely forum for such a suit would be in Bernard's domiciliary state, Kansas, or Melvin's domiciliary state. Under the relaxed standards for personal jurisdiction applied by modern courts, we are satisfied that Melvin's purposeful conduct, by his voluntary actions, was sufficient that he could anticipate possibly being haled into court in Kansas. Thus, we affirm the trial court's ruling that it had jurisdiction.
 
 II
 
 20
 Turning to the merits, we must note the factual situation that existed at the time of the agreement. The two sons were not the heirs of their living mother. It is a proposition as old as Anglo-Saxon law that a living person has no heirs. E. Coke, Commentary upon Littleton 8A (19th ed. 1853); Doctor v. Hughes, 225 N.Y. 305, 122 N.E. 221 (1919). Therefore, if either son predeceased his mother the son's estate would take nothing under the law of intestate succession in any state. Even if both survived their mother, under the law of any of the three states possibly involved here, Kansas, Florida, and New York, they could have been precluded from receiving any of their mother's property by her voluntary act, namely disposing of her property to other persons. See In re Charowhas, 181 Kan. 322, 324, 310 P.2d 947, 949 (1957), overruled on other grounds, In re Miller's Estate, 186 Kan. 87, 348 P.2d 1033 (1960); Flagler v. Flagler, 94 So.2d 592, 594 (Fla.1957); In re Cairo, 35 A.D.2d 76, 312 N.Y.S.2d 925, 927-28 (1970), aff'd, 29 N.Y.2d 527, 324 N.Y.S.2d 81, 272 N.E.2d 574 (1971). Thus, Lena was free to change her will, to transfer owned property to joint tenancy arrangements with others, to change beneficiaries on Totten trusts, or to make outright gifts to anyone whom she desired. Neither of these brothers had any power to divide or dispose of property passing from their mother to any other person than themselves.
 
 
 21
 The Helitzer brothers were two potential or "apparent" heirs who did have the power to contract between themselves as to the division of property they might receive in the event they did succeed to assets controlled by their mother at her death. The mutual promises to divide equally any property either might receive would provide the consideration necessary to make the agreement enforceable. These family settlement-type agreements are legal and favored in the law. See, e.g., In re Harper, 202 Kan. 150, 159-60, 446 P.2d 738, 746 (1968); Hendrick v. Redfearn, 88 So.2d 620, 622 (Fla.1956); Fla.Stat. Sec. 733.815; In re O'Keefe's Estate, 167 Misc. 148, 3 N.Y.S.2d 739, 740-41 (1938). There also would have been nothing improper about these brothers agreeing, while both were alive, that if one predeceased the mother and thereby received nothing under the will or otherwise, that the survivor would divide what the survivor received with the deceased's estate or with other persons. The uncertainty of which brother might survive would provide the necessary consideration to make the agreement enforceable. Therefore, such a contract could survive the death of one brother if that was the intention of the parties and the agreement memorializing such intent was sufficiently clear.
 
 
 22
 With respect to the agreement before us, the trial court found that the brothers were attempting to equalize "a relatively minor imbalance between the value of the [Totten trust] accounts designated for her two sons." R.I. 309. Despite this finding, the trial court inferred, from this poorly drawn contract, intent that the agreement should apply even if one brother predeceased the mother, and further that it required the surviving brother to share what he received by reason of his mother's death equally with the estate of the deceased brother. It construed the agreement to require equalization only with respect to Lena's assets passing to one of the brothers, not to the children or grandchildren of the brother to whom substantial assets passed.[3]
 
 
 23
 The trial court viewed the situation as two brothers concerned with being equal beneficiaries in the estate of their mother. It then tried to carry out that intent with respect to the property subject to the survivor's control. Perhaps this is commendable. Perhaps had the brothers anticipated what did happen they would have made an agreement similar to that fashioned by the court. The court may have believed its decision was in accord with the general policy of favoring family settlement agreements. But this is not a family settlement agreement in the usual sense of an agreement entered into after death to avoid disputes over property dispositions.
 
 
 24
 In our view the parties made an agreement that covered the situation that they contemplated would occur: both surviving the mother and being the only beneficiaries of the estate. Had these events occurred, the agreement would be enforceable. For the situation that did occur the agreement is inadequate and unclear as to the brothers' intent. Both parties make different objections to the district court's attempts to supply the missing terms that would make this agreement cover the actual circumstances. This case is simply one in which too many gaps are left to be filled by a court. Extending the agreement to cover the contingencies that occurred requires too many suppositions on the court's part and leaves too many uncertainties as to whether the parties' understandings can be correctly resolved.
 
 
 25
 The agreement before us assumes that both brothers will survive their mother. It does not anticipate the major contingency that in fact occurred--death of a son before the mother. We cannot read the agreement's reference that the contract "shall be binding upon heirs, legal representatives, and assigns" as literally covering this contingency. This language only applies to persons taking title through a contracting party. As noted above, neither a predeceased person nor his estate takes anything by intestacy or under the will of another. Under the law of intestate succession in any of the three states, issue of the predeceased son might take, but such taking is in their own right and not as heirs, legal representatives, or assigns of the deceased. Had Lena left a will that listed Bernard as a beneficiary and did not provide a substitute beneficiary if he predeceased her, the share Bernard would have received would have passed directly to his descendants under an anti-lapse statute, regardless of whether Kansas, Florida, or New York law applied. See Kansas Stat.Ann. Sec. 59-615; Fla.Stat. Sec. 732.603; N.Y.Est.Powers & Trusts Law Sec. 3-3.3. These descendants would take in their own right, however, and could not be bound by an agreement to which they were not parties. See In re Harper, 202 Kan. at 160, 446 P.2d at 746; Fla.Stat. Sec. 733.815; In re Perlmutter's Will, 156 Misc. 571, 282 N.Y.S. 282, 287 (1935). Thus, if Bernard's estate could take nothing so Melvin could not have enforced the contract against it, the estate may not enforce the contract against Melvin.
 
 
 26
 The agreement between the Helitzer brothers did not anticipate another major contingency that in fact occurred--that Lena would leave large sums to persons other than the two sons. The agreement provides expressly that the two will equally share "in all the assets belonging to [Lena] on the date of her demise." Def.Ex. J. As noted above, they cannot contract with respect to assets their mother disposed of to someone else. Bernard's death caused Lena to rethink her desires as to the disposition of her property. She reordered her priorities, never executing a new will, removing Bernard as a beneficiary to some of her Totten trust accounts, and closing other accounts for which Bernard was a beneficiary, in each case channelling the money into accounts for which Melvin and his children were beneficiaries. Grandchildren and great grandchildren directly received $44,132.24, more than one-fourth of all Lena's property. Suppose Lena had not changed her stock ownership and had not destroyed her will. The will provided for a substitute gift to Bernard's issue; his only daughter would take this share as substitute beneficiary. As the trial court construed the equalization agreement it would have had to ignore that gift to Bernard's daughter and require Melvin to share equally with Bernard's estate what Melvin received under the will and as beneficiary of Totten trusts.
 
 
 27
 Finally, the equalization agreement also contemplates a probate estate in Florida that was never administered. Bernard's estate asserts as error the trial court's permitting in Melvin's accounting a deduction for hypothetical probate and income tax costs that were never incurred.
 
 
 28
 The brothers knew how to anticipate a premature death--they did so in the agreement treating the trust property left by their father--but they did not provide for that possibility in their agreement concerning their mother's property. In this case the settlement agreement must be read only to address what its terms reasonably anticipated, a personal contract between two brothers to divide equally what they would take from their mother when they both survived her. When one predeceased the mother, the contract, not having dealt with this important contingency, became unenforceable. The law of all of the states possibly involved here forbids a court from rewriting a contract to supply essential terms that the parties have omitted. See Anderson v. Rexroad, 175 Kan. 676, 679, 266 P.2d 320, 323-24 (1954); Wood v. Ozark Pipe Line Co., 142 Kan. 333, 336, 46 P.2d 614, 616 (1935); Home Development Co. v. Bursani, 178 So.2d 113, 114, 117 (Fla.1965); Beach Resort Hotel Corp. v. Wieder, 79 So.2d 659, 663 (Fla.1955); Wilson Sullivan Co. v. International Paper Makers Realty Corp., 307 N.Y. 20, 119 N.E.2d 573, 575 (1954).
 
 
 29
 If we had any thoughts that the words of the contract should be stretched to cover these unanticipated contingencies, they are dispelled by our cognizance of the rule that ambiguities are resolved against the party who drafted the agreement. Here Bernard must be considered to be that draftsman, because his lawyer prepared it. Further, we think the court should not strain unduly to construe an agreement respecting an anticipated inheritance. It is Lena Helitzer's property that is being distributed. Lena did not intend to benefit Bernard's widow. That may seem unjust to the widow, but persons with legal capacity are entitled, save for statutory limitations, to make unjust and unreasonable dispositions of their own property.
 
 
 30
 Because there was no contract to enforce after the death of Bernard, there could be no unlawful conversion or tort justifying punitive damages. Our decision has mooted consideration of the alleged errors in the calculation of damages and what property was to be included in the agreement. The judgment is REVERSED AND REMANDED with directions to enter judgment for defendant Melvin Helitzer.
 
 
 
 *
 Honorable John L. Kane, Jr., United States District Judge for the District of Colorado, sitting by designation
 
 
 [1]
 The so-called "Totten" trust, named for the leading case in which its validity was recognized, see Matter of Totten, 179 N.Y. 112, 71 N.E. 748 (1904), permits individuals to place money in a savings account in their own name with a simple designation that they are "trustee" for another. While living the donors may treat the fund as their own, but on a donor's death what remains passes to the named beneficiary without the donor having gone through the formalities of making a will and without probate. It is sometimes called the "poor person's will."
 
 
 [2]
 Unequal treatment of the grandchildren may have been prompted by the fact that Bernard's only child, as survivor of her father, would take on Lena's death a share under a 1955 settlement agreement respecting a trust created in Bernard's father's will
 
 
 [3]
 
 The trial court found that Melvin received the following of
 Lena's assets as Totten trust beneficiary or through a right of
 survivorship:
 A. Totten Trust Accounts
 ---------------------
 Bank/S&L Balance
 -------- -------
 Washington Fed. S&L Assoc. of Miami Beach, Fla. $ 6,380.26
 Washington Fed. S&L Assoc. of Miami Beach, Fla.
 Financial Fed. S&L, Miami Beach, Fla. 21,648.78
 American S&L of Florida, Miami Beach, Fla. 1,296,06
 American S&L of Florida, Miami Beach, Fla.
 Pan American Bank of Miami Beach, Fla. 848.32
 Barnett Bank of Miami, Florida 2,648.00
 ------------
 $51,800.81
 ------------
 B. Brokerage Account (at Gruntal & Co.,
 ----------------- New York, N. Y.)
 Shares or Face
---------------
Amount of Bonds Description Value
--------------- --------------------------- ----------
 220 American Tel. & Tel. $13,117.50
 220 Brooklyn Union Gas Co. 4,482.50
 200 CPC International, Inc. 9,725.00
 360 Consolidated Foods 8,730.00
 100 El Paso Co. 1,600.00
 200 Gulf Oil Corp. 4,750.00
 200 Kansas Power & Light 4,300.00
 100 National Fuel Gas 2,587.50
 100 New England Electric System 2,187.50
 10 Northwest Energy Co. 347.50
 200 Stone and Webster, Inc. $ 9,225.00
 300 Union Camp Corp. 12,262.50
 $5,000 Consolidated Edison
 Debentures (Due 3-1-2004) 4,718.75
 ----------
 $78,033.75
 ----------
 See R. I, 311.
 ---
 Lena's other assets passed to the following individuals as
beneficiaries under her Totten trust accounts:
 A. Jacqueline Goldman (Bernard's daughter)
 ------------------
 William Goldman and Jeffery Goldman
 -----------------------------------
 (Jacqueline's sons)
 American S&L $ 8,605.10
 B. Adrianne Helitzer (Melvin's daughter)
 -----------------
 Washington Fed. S&L $10,249.65
 Financial Fed. S&L 2,576.76
 Financial Fed. S&L 3,865.14
 ----------
 $16,691.55
 ----------
 C. Debra Helitzer (Melvin's daughter)
 --------------
 Washington Fed. S&L $ 5,104.22
 Financial Fed. S&L 2,565.76
 Financial Fed. S&L 3,865.14
 ----------
 $11,535.12
 ----------
 D. Adrianne and Debra Helitzer (joint account)
 ---------------------------
 American S&L $ 7,300.47
 See Plaintiff's Ex. 15 at 4-5.
 ---